FILED
FEB 16 2010
CLERK
United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| In re | Case No. 09-56695 ASW |
|---|---|
| ROBERT BRUCE AYRES | Chapter 7 |
| Debtor. | |

**MEMORANDUM DECISION ON DEBTOR'S MOTION TO REDEEM VEHICLE**

Before the Court is the Motion for an Order Redeeming Vehicle Under USC § 722 and Avoiding Lien (the "Motion") filed by Debtor Robert Ayres ("Debtor") on October 8, 2009. The vehicle at issue in the Motion is a 2003 Acura 3.2 CL Type S, which, according to Debtor's declaration in support of the Motion, is his sole means of transportation (the "Vehicle"). The secured creditor whose debt is the subject of the Motion is Americredit Financial Services America Inc. ("Americredit").

By the Motion, Debtor seeks an order (1) fixing the redemption value of the Vehicle in the amount of $4,000 and (2) compelling Americredit to release its lien and provide clear title to the Vehicle upon payment. In response to the Motion, Americredit filed an Opposition to Debtor's Motion to Redeem Personal Property (the "Opposition") and three supporting declarations -- one by Kristina

Keeling, the custodian of records for Americredit (the "Keeling Declaration"); one by Americredit's counsel, John F. Patton, Esq. (the "Patton Declaration"); and one by Don Ferguson, an independent auto appraiser and inspector (the "Ferguson Declaration"). The Opposition asks that the Court determine the redemption value of the Vehicle to be no less than $8,975. An evidentiary hearing was held on the Motion and Americredit's opposition thereto on December 14, 2009.

Debtor represents himself in *propria persona*. Americredit is represented by John F. Patton, Esq. of the law firm of Cooksey, Toolen, Gage, Duffy & Woog.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule").

I.

EVIDENCE PRESENTED

A. Debtor's Schedules

Debtor's Schedule B values the Vehicle at $4,500. Debtor's Schedule D shows Americredit has an outstanding debt of approximately $13,000 which is secured by the Vehicle. Debtor's Schedules list no other vehicles or secured debt of any kind.

B. Debtor's Motion

Debtor states he originally leased the Vehicle, new, beginning in August 2002. Declaration of Robert B Ayres in Support of Motion to Redeem Vehicle per USC § 722 and Avoiding Lien ("Debtor's Declaration") at 1. Upon the expiration of his lease on August 9, 2006, Debtor purchased the Vehicle with a loan from Americredit for

$16,095.75, plus taxes and fees. Id. At the time of purchase, the Vehicle had 75,334 miles and was, in Debtor's opinion, in "good" condition. Id.

As of October 8, 2009, the date of Debtor's Declaration, the Vehicle had 120,900 miles and was, in Debtor's opinion, in "fair" condition. Id. Debtor asserts that the Vehicle currently needs approximately $4,255.97 in repairs for a timing belt replacement, transmission service, a major scheduled service, replacement of struts and alignment. Id. Debtor attaches a printout of a repair estimate from Acura of Concord dated October 7, 2009 in support of these repairs. This printout lists $1506.02 in repairs related to the struts. Debtor has hand-written at the bottom of this estimate an additional $2,650 for the 105,000 mile scheduled service, which includes the timing belt, and an additional $99.95 for alignment.

Debtor, in his opinion as the owner of the Vehicle, believes the Vehicle has a current "liquidation value" of $4,000, given the mileage, condition of the vehicle and market conditions. Motion and Debtor's Declaration. In support of this valuation, Debtor, who is very knowledgeable about the condition and value of cars, attaches an Intelliprice appraisal report he received from Beshoff Infiniti of San Jose on August 18, 2009. This Intelliprice report estimates a trade-in value of $3,065-$4,755 for the Vehicle. The Intelliprice report notes the mileage at 119,000. The notes regarding "trade-in condition" state that the Vehicle is in "Good" condition and paint "still shines" although "some flaws" are noted on the front bumper, the front spoiler and the hood and "some dings/dents" are noted on the body.

C.  <u>Opposition by Americredit</u>

Americredit opposes the Motion on two bases: (1) Debtor's alleged failure to value the Vehicle's redemption amount according to acceptable standards and (2) Americredit's evidence with respect to the redemption value of the Vehicle. Opposition at 2:1-3. Americredit argues that the appropriate valuation for redemption purposes is the retail value of the Vehicle, not the trade-in or liquidation value relied upon by Debtor. In its Opposition, Americredit values the Vehicle at not less than $8,975. Opposition at 5:7-8. In support of this valuation, Americredit submits an online printout from the N.A.D.A. Official Used Car Guide dated October 19, 2009, which gives a "clean retail" value for the Vehicle (with 120,000 miles) of $8,975. Exhibit D in support of Opposition. This same printout also gives a $4,125 "rough trade-in" value, a $5,300 "average trade-in" value and a $6,275 "clean trade-in" value for the Vehicle. <u>Id.</u>

As further support for its valuation, Americredit submits a printout of a search from AutoTrader.com performed by John Patton, Americredit's counsel, on October 19, 2009. Patton Declaration at ¶ 2 and Exhibit D in support of Opposition. The AutoTrader.com search identifies 4 matches for a 2003 Acura CL with mileage more than 100,000, within 500 miles of Debtor's Postal ZIP Code. Patton Declaration at ¶ 3. The vehicles ranged in **asking price (not sales price)** from $10,998 to $7,495, with an average asking price of $9,120. Patton Declaration at ¶ 4. Each of these AutoTrader.com listings was with an auto retailer. Exhibit D in support of Opposition.

D. _Ferguson Declaration_

On November 12, 2009, Americredit filed a Declaration of Don Ferguson in Support of Opposition to Motion to Redeem Personal Property (the "Ferguson Declaration"). Mr. Ferguson is an independent appraiser and inspector of vehicles and has been so employed for 30 years. Ferguson Declaration at ¶ 2. Mr. Ferguson's employer, Property Damage Appraisers, was retained by Americredit to appraise the Vehicle. Id. at ¶ 4. On October 27, 2009, Mr. Ferguson inspected the Vehicle's exterior and interior. Mr. Ferguson did not look under the hood or otherwise evaluate the mechanical condition of the Vehicle at all. Based upon his limited inspection of the Vehicle, Mr. Ferguson categorizes the Vehicle as being in "good to excellent" condition. Id. at ¶ 6. The mileage on the Vehicle at the time of Mr. Ferguson's inspection was 121,432. Id. Based upon his inspection, his analysis of comparable vehicles on AutoTrader.com, and the NADA Used Car Guide, it is Mr. Ferguson's opinion that the price a retail merchant would charge Debtor to replace the Vehicle, given its age and condition and without deducting the costs of sale and marketing, is $7,883.80.

E. _Testimony at Evidentiary Hearing_

Debtor served as his only witness at the December 14, 2009 evidentiary hearing. Debtor testified that he worked for approximately 12 years, from 1985 until 1997, inspecting vehicles and/or supervising others' inspections of such vehicles. Debtor has been the Vehicle's sole lessee/owner. Given Debtor's knowledge of automobiles, his past work experience and his sole possession of the Vehicle, Debtor knows the Vehicle's condition well.

Debtor also testified that he consulted with multiple dealers in an attempt to obtain an independent valuation. One such dealer gave Debtor an estimated trade-in value for the Vehicle between $3,065 and $4,755. Exhibit 2. Debtor noted that despite his exhaustive search, he could find no like-condition comparable vehicles for sale by a dealer in the Bay Area. Debtor testified that he was advised by the dealers with which he consulted that the Vehicle is not of the type that would be sold by a dealer to the retail public, but, rather, the Vehicle would be sent by the dealer to an auto auction. Therefore, if the Court accepts Debtor's position on this issue, the retail value of this automobile would be the value that Americredit would receive at auction. That value would be approximately $3,000 to $4,700, the same as indicated on the Intelliprice report submitted as Exhibit 2, as Debtor explained.

Through his testimony as the Vehicle's owner, Debtor introduced nine exhibits:

| Exhibit | Description |
|---|---|
| 1 | Five pages of photos of the Vehicle |
| 2 | Intellichoice appraisal dated August 18, 2009, same as previously submitted as an exhibit to Debtor's Declaration. |
| 3 | Edmunds.com pricing report dated December 13, 2009, which gives the following values of the Vehicle in "rough" condition and with 123,500 miles and within Debtor's ZIP code:<br>Trade-In $2,494<br>Private Party $3,427<br>Dealer Retail $4,288 |

| | | |
|---|---|---|
| | 4 | Edmunds.com pricing report dated November 12, 2009, which gives the following values for the Vehicle in "average" condition and with 121,600 miles and within Debtor's ZIP code:<br>Trade-In        $3,041<br>Private Party   $4,036<br>Dealer Retail   $4,977 |
| | 5 | A copy of the maintenance log for the Vehicle showing the service items recommended at 105,000 miles, which includes replacing the timing belt |
| | 6 | A Maintenance Schedule from AutoWest Acura of Stevens Creek, noting that a timing belt replacement is recommended at 105,000 miles. The second page is a photocopy of the business card of Gloria Poirier, Assistant Service Manager at AutoWest Acura of Stevens Creek, above which various maintenance items have been handwritten with itemized costs totaling $4,451.95. |
| | 7 | A printout from AutoTrader.com dated December 12, 2009 showing two vehicles comparable to the Vehicle listed for sale -- one at a **reduced price** of $7,995 (this is the same one previously valued as part of the Patton Declaration at 8,995) and one at $9,500. |
| | 8 | Lease Turn-In / PDA Package description from www.pdacorporation.com, which includes a road test and under-hood component check. Debtor emphasized that Mr. Ferguson failed to do either as part of his appraisal, but should have. |
| | 9 | The repair estimate dated October 17, 2009 from Acura of Concord previously submitted as a Exhibit to Debtor's Declaration |

At the evidentiary hearing, Americredit submitted two exhibits. The appraisal by Don Ferguson valuing the Vehicle at $7,833.80 and dated October 28, 2008 was admitted as Exhibit A. (This valuation was revised to $7,617.85 through Mr. Ferguson's testimony on the

stand, in light of a mathematical error by Mr. Ferguson discovered in the course of Mr. Ferguson's testimony.) A printout from Edmunds.com obtained by Mr. Patton on December 1, 2009 showing the "True Market Value" for the Vehicle to be $6,523 (assuming the Vehicle is in "clean" condition and has 121,600 miles) was admitted as Exhibit B.

The primary witness called by Americredit was Mr. Ferguson.[1] Mr. Ferguson testified that he did a physical "walk around" inspection of the Vehicle. As part of this inspection, Mr. Ferguson asked Debtor if there was anything that would increase or decrease the value of the Vehicle. Debtor's response was that the Vehicle was behind on two scheduled maintenance services and that a timing belt needed to be replaced. Mr. Ferguson testified that he included the costs to remedy the maintenance items indicated by Debtor in his valuation of the Vehicle. Mr. Ferguson reaffirmed his opinion that the Vehicle, at the time of his inspection, was in average to above average condition.

To take into account the repairs that may need to be made to the Vehicle, Mr. Ferguson consulted with the service department of an Acura dealer in Los Gatos. After eliminating the redundant items on the two missing scheduled maintenance services, the service agent provided an estimate of $1,795.85 to complete the service items needed, including replacement of the timing belt. After considering these service estimates, Mr. Ferguson arrived at an estimated retail price for the Vehicle of $7,617.85.

---

[1] Mr. Patton, Americredit's counsel, was also sworn in as a witness to help admit Exhibit B.

On cross-examination, Debtor asked Mr. Ferguson for his estimate to complete the body work Debtor believes is needed to render the Vehicle in saleable condition. Mr. Ferguson disagreed with Debtor as to the appropriate means of remedying the body defects, and estimated that the body work could be obtained for a total cost of $300 from a body repair specialist, although Mr. Ferguson did not have a written estimate from any such specialist. If the same body work were done by the dealer itself, then Mr. Ferguson estimated the cost would be $600. However, Mr. Ferguson also stated that, in his opinion, a dealer could sell the vehicle "as is", without the body work, for his estimated value of $7,617.85.

II.

ANALYSIS

By the Motion, Debtor seeks to redeem the Vehicle for the Vehicle's "liquidation value" of $4,000.00 citing <u>In re Weathington</u>, 254 B.R. 895 (6th Cir. BAP 2000). However, <u>Weathington</u> was decided prior to the Bankruptcy Abuse and Consumer Protection Act of 2005 ("BAPCPA"), Pub.L. No. 109-8, 119 Stat. 23 (2005) and the law on redemption was substantially changed under BAPCPA.

The redemption of property by a debtor is governed by Bankruptcy Rule 6008 and Bankruptcy Code[2] sections 722 and 506(a). Bankruptcy Rule 6008 provides, in pertinent part, as follows:

> On motion by the debtor . . . and after hearing on notice as the court may direct, the court may authorize the

---

[2] Unless otherwise provided, all references to code sections shall mean the Bankruptcy Code, as codified in Title 11 of the United States Code, 11 U.S.C. § 101, <u>et seq.</u>, including all amendments thereto, including BAPCPA.

> redemption of property from a lien or from a sale to enforce a lien in accordance with applicable law.

Bankruptcy Rule 6008. Bankruptcy Code § 722, in turn, provides:

> An individual debtor may, whether or not the debtor has waived the right to redeem under this section, redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt, if such property is exempted under section 522 of this title or has been abandoned under section 554 of this title, by paying the holder of such lien the amount of the allowed secured claim of such holder that is secured by such lien in full at the time of redemption.

11 U.S.C. § 722. Finally, Bankruptcy Code § 506(a)(2) provides:

> If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

11 U.S.C. § 506(a)(2).[3]

Although the language of Bankruptcy Code § 506(a)(2) appears to be quite specific, the Bankruptcy Code does not articulate a specific methodology to obtain the "price a retail merchant would charge for property of that kind considering the age and condition of the property." The Ninth Circuit has not yet established a method for retail valuation under § 506(a)(2), and courts outside

---

[3] Debtor argued in the Motion that the valuation should be made as of the date of the hearing under In re Lopez, 224 B.R. 439 (Bankr. C.D. Ca. 1998). However, Lopez was issued prior to the enactment of BAPCPA. The changes made to Bankruptcy Code § 506 by BAPCPA now make clear that the valuation is "as of the date of the filing of the petition."

the Ninth Circuit have adopted a variety of methods.[4] The two cases from within the Ninth Circuit to address the issue have calculated retail value "by adjusting the Kelley Blue Book or N.A.D.A. Guide retail value for a like vehicle by a reasonable amount in light of the evidence presented regarding the condition of the vehicle and any other relevant factors." In re Morales, 387 B.R. 36, 45 (Bankr. C.D. Cal. 2008); accord, In re Guerra, 2008 WL 3200831, *3 (Bankr. E.D. Cal. 2008).

---

[4] See, e.g., In re De Anda-Ramirez, 359 B.R. 794 (10th Cir. BAP 2007) (Rejecting the application of the Kelley Blue Book "retail value" as the appropriate measure under the circumstances and noting: "Other than both containing the word "retail," the Code and KBB definitions have little in common. The Bankruptcy Code's definition of "retail" includes an adjustment for the age and condition of the vehicle; KBB defines "retail" as the price for a vehicle that is in "excellent condition" with the proviso that less than 5% of vehicles for sale qualify as "excellent." Clearly, these two are not equivalent and Midwest's reliance on the KBB retail value is misplaced."); In re Cook, 415 B.R. 529 (Bankr. D. Kan. 2009)("[I]n this case, NADA Clean Retail, adjusted for needed mechanical, body, and interior repairs, as well as for other Rash items that the debtor does not receive (like reconditioning or detailing), is the best approximation of value for personal use vehicles subject to § 506(a)(2) treatment."); In re Berry, 2008 WL 2064777, at *4 (Bankr. D. Vt. 2008)(refusing to invalidate a bankruptcy local rule using the starting point for valuation as the midpoint between the N.A.D.A. wholesale value and the N.A.D.A. retail value, and noting "that 'the price a retail merchant would charge' is not necessarily equivalent to 'the retail value.'"); In re Young, 390 B.R. 480, 488 (Bankr. D. Me. 2008)(rejecting Debtor's valuation as insufficient because it started with the Kelley Blue Book "trade-in" value rather than retail value); In re Clark, 2007 WL 671346 (Bankr. N.D. Ohio Feb. 27, 2007) (calculating retail value of car as the midpoint between two proffered retail values); In re Kidwell, 2007 WL 2934866, at *5 (Bankr. E.D. Tenn. 2007) (calculating retail value of car based on Kelley Blue Book private party value based on appraiser testimony that private party value approximates retail price if paid in cash in full); In re Ortiz, 2007 WL 1176019, at *2-3 (Bankr. S.D. Fla. 2007) (calculating retail value of car by deducting the hypothetical cost of repairs from the retail value established by expert testimony); In re Mayland, 2006 WL 1476927, at *3 (Bankr. M.D.N.C. May 26, 2006) (calculating retail value of car as 90% of N.A.D.A. Guide retail value, less cost of necessary repairs).

The parties have submitted evidence valuing the Vehicle between $2,494 and $8,975. While there are slight discrepancies in the mileage used by the parties at various times to arrive at these valuations, the variance in valuation depends primarily on two other factors -- the category used for the Vehicle's condition and the category for the type of sale.

As to the issue of the Vehicle's condition, Debtor testified that the Vehicle is in "fair" or "rough to average" condition. Debtor's Declaration, Trial Exhibits 3 and 4. Americredit, in turn, believes the Vehicle is in "good to excellent" condition. Ferguson Declaration at ¶ 6. The Vehicle is neither "rough" nor "clean" -- the outward limits to which the parties push their respective opinions -- but, rather, precisely in the middle where both parties agreed it might also be. Weighing the evidence presented, the Court finds the Vehicle is "average" under the Edmunds.com and N.A.D.A. guidelines.

The category selected for the type of sale also greatly impacts the resulting valuation. The types of sale considered by the N.A.D.A. Guide and Edmunds.com range from "trade-in" to "private sale" to "dealer retail" or "clean retail." While it might be tempting to equate "dealer retail" or "clean retail" with "the price a retail merchant would charge" under Bankruptcy Code § 506(a)(2), it would be a mistake to do so:

> Other than both containing the word "retail," the Code and KBB definitions have little in common. The Bankruptcy Code's definition of "retail" includes an adjustment for the age and condition of the vehicle; KBB defines "retail" as the price for a vehicle that is in "excellent condition" with the proviso that less than 5% of vehicles for sale qualify as "excellent." Clearly, these two are not equivalent and [the creditor's] reliance on the KBB retail value is misplaced.

In re De Anda-Ramirez, 359 B.R. 794, 797 (10th Cir. BAP 2007); accord, Morales, 387 B.R. at 45-46. That being said, many courts, including the two decisions from within the Ninth Circuit which have addressed this issue, have used the "retail" value of these guides as a starting point and then adjusted the values downward to account for the vehicles mileage and condition, or other applicable factors. See supra p. 11 and note 4. Rather than starting at the high end and adjusting downward, other courts have chosen to use the "private sale" category since it allows for the valuation of vehicles in a variety of less than "clean" conditions. In addition, as already noted by one court, an all-cash payment at the time of sale -- which is required under Bankruptcy Code § 506(a)(2) -- is more akin to a "private sale" than a sale through a dealership. In re Kidwell, 207 WL 2934866, at *5 (Bankr. E.D. Tenn. 2007). Regardless of which approach is taken -- either start high and deduct the costs necessary to bring that vehicle to the "clean" sale condition, or use a valuation that already takes into account the less-than-perfect condition and an all cash sale -- the end result at which you arrive should be roughly the same.[5]

---

[5] This case also raises another interesting issue -- how to value a vehicle under the post-BAPCPA version of Bankruptcy Code § 506(a)(2) where the vehicle is of such an age and/or condition that it is of the type that a retailer would likely only sell it at a wholesale auction. Debtor asserts that because of its condition, the Vehicle would likely be sold at a car auction and not be sold by a retail car dealer. Creditor, through Mr. Ferguson's testimony, claims that the Vehicle **could** (but not necessarily would) be sold by a dealer. The Court finds that both Debtor and Mr. Ferguson are telling the truth. Debtor is correct that because of its mechanical and body condition there is a substantial likelihood that the Vehicle would be sold "as is" at an auction and, if so, would be sold for approximately $3,000 to $4,700, as noted on the Intelliprice report submitted as Exhibit 2. The Court
(continued...)

Although Mr. Ferguson's appraisal used the N.A.D.A. Guide as a starting point, both parties cited and relied upon the "True Market Value" derived from Edmunds.com at the evidentiary hearing as being representative of the actual value that would be received, not the suggested retail value as appears to be the case of values given in the KBB and N.A.D.A. Guide. Indeed, Edmunds "True Market Values" purport to be based on "a proprietary formula developed by Edmunds.com" to take "into account, for each vehicle" a litany some ten separate market factors including "current actual transaction prices." Exhibit 4, page 2.

Neither party used the Petition Date as the valuation date. While the $4,036 private party sale valuation listed on Debtor's Exhibit 4 may be close, it is nonetheless dated roughly four months after the Petition Date and, therefore, necessarily lower. Based

---

[5](...continued)
accepts Debtor's testimony that many dealers, especially higher-end dealers, would not carry this car on their lots, especially in its present condition. However, the Court also accepts Mr. Ferguson's position that the Vehicle could be sold by a car dealer. The Court believes that Americredit could find used car dealers in the Bay Area that would be willing to fix up this car and put it on their lots or even some car dealers that might be willing to sell it "as is." One way to handle this situation could be to determine a percentage likelihood that the Vehicle would be sold at auction and a separate percentage likelihood that the Vehicle would be sold on a dealer's lot. Then, one would multiply the likely auction price by the percentage likelihood that the Vehicle would be sold at an auction and multiply the dealer lot price by the percentage likelihood that the Vehicle would be sold on a dealer's lot. Then those two resulting numbers would be added together to arrive at a valuation. This approach, which is similar in methodology to a standard litigation analysis, does not have case support as of the present time. The Court has decided, for the purposes of the case at hand, to turn to the Edmunds valuations for guidance. However, the Court recognizes that in some circumstances, the only, or the most, realistic "retail" market for a vehicle will be a wholesale auction.

on the Court's own research, the private party resale "true market value" for the Vehicle as of the Petition Date is $5,136 per Edmunds.com.

If the alternative approach of starting with the "clean" dealer retail number and adjusting downward is taken, then the result, as predicted, is roughly the same. Mr. Ferguson's valuation adopted this approach. While Mr. Ferguson's appraisal accounts for the regular scheduled maintenance services that are needed for the Vehicle, including the replacement of the timing belt, his appraisal does not include the costs for the replacement of the Vehicle's struts or the body work needed to bring the Vehicle up to clean saleable condition. Americredit did not dispute the need for the replacement of the struts. In addition, Mr. Ferguson did not dispute the fact that some body work was needed on the Vehicle, although Mr. Ferguson did disagree with Debtor on the means of remedying the body defects. Mr. Ferguson testified that the Vehicle could be sold "as is" with only the maintenance work he had accounted for in his appraisal, and without the body work or struts. However, Mr. Ferguson also indicated that "it could take a while" for a dealer to sell the Vehicle in that condition. If the costs for the struts ($1,506.02) and the minimal body work Mr. Ferguson agreed is needed ($600) are taken into account, the value of the Vehicle would be $5,511.83[6] -- which is quite close to the $5,136 value reached under the other methodology.

---

[6] The value arrived at by Mr. Ferguson, as stated at the evidentiary hearing, is $7,617.85. Debtor's estimate for replacing the struts, which Mr. Ferguson verified is reasonable, is $1,506.02. Mr. Ferguson estimated the cost of the body work which Mr. Ferguson agreed is necessary is approximately $600 if performed by a dealer.

## III.

## CONCLUSION

Given the evidence presented regarding the Vehicle's condition, the Court finds that the replacement value of the Vehicle is $5,136. Debtor shall submit a proposed form order authorizing the redemption of the Vehicle under Bankruptcy Code § 722 upon the payment of $5,136 to Americredit.

Dated: 2/16/10

ARTHUR S. WEISSBRODT
UNITED STATES BANKRUPTCY JUDGE

Court Service List

Robert Bruce Ayres
142 N. Milpitas Blvd. #117
Milpitas, CA 95035

John F. Patton, Esq.
Cooksey, Toolen, Gage, Duffy & Woog
535 Anton Boulevard, Tenth Floor
Costa Mesa, CA 92626-1977

Mohamed Poonja
P.O. Box 1510
Los Altos, CA 94023-1510

Office of the U.S. Trustee
U.S. Federal Bldg.
280 S. 1st St. #268
San Jose, CA 95113-3004